UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SHIRLEY F. SANTILLANA,

                    Plaintiff,

-vs-                                              Case No.  6:09-cv-2095-Orl-19KRS

FLORIDA STATE COURT SYSTEM,
EIGHTEENTH JUDICIAL CIRCUIT
SEMINOLE COUNTY COURTS; CLAYTON
SIMMONS; SUE BLOCK; and WAYNE
FOUNTAIN,

                    Defendants.
_____

# ORDER

This case comes before the Court on the following:

1.   Motion for Summary Judgment by Defendants Clayton Simmons, Sue Block, and
     Wayne Fountain (Doc. No. 73, filed Dec. 23, 2010);

2.   Memorandum in Opposition to Defendants' Motion for Summary Judgment by
     Plaintiff Shirley F. Santillana (Doc. No. 77, filed Jan. 19, 2011);

3.   Notice of Filing of Exhibits by Plaintiff Shirley F. Santillana (Doc. No. 78, filed
     Jan. 19, 2011);

4.   Notice of Filing of Exhibit H by Plaintiff Shirley F. Santillana (Doc. No. 79, filed
     Jan. 19, 2011); and

5.   Reply to Response in Opposition to Motion for Summary Judgment by Defendants
     Clayton Simmons, Sue Block, and Wayne Fountain (Doc. No. 83, filed Feb. 2, 2011).

**Background**

## I.  Undisputed Facts

This case concerns the termination of Plaintiff Shirley F. Santillana from her position as the

Mediation Coordinator for the Florida State Court System, Eighteenth Judicial Circuit Court, in and

for Seminole County, Florida ("Seminole County Circuit Court").  (Doc. No. 20 ¶¶ 2, 4, 10-11, filed

Apr. 29, 2010.)  Santillana, who is white, contends that Defendants Sue Block, Wayne Fountain, and

Clayton Simmons discriminated against her by covering up and ignoring the wrongdoings of Karen

Colbert, a black employee of the Seminole County Circuit Court who was supervised by Santillana.

(Doc. No. 73-4 ¶ 6; Doc. No. 79-1 at 18.)  Santillana further alleges that she was terminated on the

pretextual grounds that she was not a "good fit" and had deficient management and computer skills.

(Doc. No. 73-1 at 12, 43; Doc. No. 79-1 at 19.)

### A.  Position of Mediation Coordinator

Pursuant to the Seminole County Circuit Court's job posting, the position of Mediation

Coordinator for which Santillana was ultimately selected required a bachelor's degree and the

following skills:

> Knowledge of the concepts and goals of mediation and conflict resolution process.
> Knowledge of problem solving techniques and case management.  Ability to
> communicate clearly and concisely orally and in writing.  Ability to work
> independently, establish priorities and define program goals.  Ability to operate a
> personal computer and proficient use of necessary software applications (Microsoft
> Outlook, Word, Excel, and Access).  Ability to track and compile monthly statistics.
> Ability to track and audit monthly revenue collections.  Ability to generate a
> database in order to track and schedule cases.

(Doc. No. 73-1 at 53.)

Both Santillana and Colbert applied for the position of Mediation Coordinator.  (Doc. No.

73-5 ¶ 7.)  Colbert had been working in the Seminole County Circuit Court mediation department

as a Court Program Specialist II for over two years prior to the Mediation Coordinator vacancy. (Doc. No. 73-4 ¶ 1, 3; Doc. No. 73-1 at 53.)  Colbert helped to establish the mediation department, designed some of the methods used by the department, was generally knowledgeable about the department, and ran the department on an interim basis for a few months after the departure of the former Mediation Coordinator.  (Doc. No. 73-4 ¶¶ 4, 6-7; Doc. No. 73-5 ¶¶ 6-7, 10; Doc. No. 73-2 at 5.)  Further, Colbert was the only employee who knew how to use the Foxpro mediation scheduling program, (Doc. No. 78-3 at 6-7; Doc. No. 83-3 at 3), and according to Santillana, Colbert knew the software "very well."  (Doc. No. 77-4 at 53.)  However, Colbert did not meet the educational requirement of a bachelor's degree and was not selected to interview for the position of Mediation Coordinator.  (Doc. No. 73-5 ¶ 7; Doc. No. 73-1 at 53; Doc. No. 73-8 at 7.)

Santillana had previously served as the Teen Court Coordinator in Volusia County, Florida. (Doc. No. 73-14 at 18.)  She received positive recommendations from Volusia County judges and attorneys for creating and operating the Teen Court program.  (Doc. No. 78-4 at 25-31.)  According to Sue Block, the Court Operations Manager for the Seminole County Circuit Court, Santillana's resume and references indicated that she was proficient in building and running a program, including the ability to coordinate several people to accomplish program goals.  (Doc. No. 77-4 at 5.)  Block averred that Santillana's documented ability to manage people was a key factor in the decision to offer her the position, despite the fact that she had no mediation experience.  (*Id.*)  Similarly, Wayne Fountain, who was Santillana's direct supervisor and served as the Deputy Court Administrator and Chief Technology Officer, stated that Santillana was hired despite lacking the preferred mediation experience due to her resume and recommendations touting her ability to run a program and manage people.  (Doc. No. 73-5 ¶¶ 1, 8; Doc. No. 78-3 at 15.)

Santillana worked as the Senior Mediation Coordinator from November 6, 2007 until January 22, 2008.  (Doc. No. 73-1 at 10; Doc. No. 73-14 ¶ 3.)  Her responsibilities included supervising Colbert, overseeing the scheduling of mediations, tracking and compiling data related to the number of mediations conducted and the cost of the mediations, generating monthly statistical reports regarding the mediations, and maintaining a database consisting of scheduling and case-specific information related to mediations.  (Doc. No. 73-5 ¶ 13; Doc. No. 33-4 at 51.)

On her first day of work, Santillana learned from Fountain that she would be working with Colbert and that Colbert had applied for the Mediation Coordinator position offered to Santillana.  (Doc. No. 73-5 ¶ 9; Doc. No. 73-1 at 15.)  Fountain explained to Santillana that Colbert had run the mediation program while a replacement was sought and that Colbert knew the mediation program very well.  (Doc. No. 73-5 ¶ 10.)  Fountain also told Santillana that Colbert "had been in the department a long time, [that Colbert was] very entrenched in her ways, and that [the situation] might be problematic for [Santillana]."  (Doc. No. 73-9 at 5.)  Fountain assured Santillana "that as a manager [he] would be there in her corner to support her in any way [he] could."  (Doc. No. 78-3 at 5.)

Fountain testified that "from the get go there was friction between" Santillana and Colbert, and he explained that Santillana "came into a hostile environment" on account of Colbert being upset that she was not given an opportunity to obtain the Mediation Coordinator position given to Santillana.  (Doc. No. 78-3 at 11.)  According to Judge Clayton Simmons, who then served as the chief judge of the Seminole County Circuit Court, he and Fountain told Santillana when she was hired that Colbert "was probably gonna be unhappy because she didn't get [Santillana's] job, and

that . . . was something that she, as a manager, was gonna have to deal with, and she assured us she was up to that task."  (Doc. No. 78-4 at 10.)

Fountain maintained that despite advising Santillana to take her time learning her job and the mediation process, she failed to heed such advice by seeking to change to the mediation program without a full understanding of her role, Colbert's role, the mediators' roles, or the mediation process generally.  (Doc. No. 73-5 ¶¶ 11-12.)  During her second week of work, Santillana traveled to the Seminole County Circuit Court's counterpart in Brevard County to meet with court personnel to discuss their procedures.  (Doc. No. 73-9 at 5.)  According to Fountain, Santillana returned with suggestions on how the mediation department at the Seminole County Circuit Court should be changed.  (*Id.*)  In response, Fountain stated that he was willing to take anything under advisement and suggested that Santillana continue to learn her position.  (*Id.* at 6.)  However, Fountain felt that Santillana "did not try hard enough to sit back and learn the business."  (*Id.* at 5.)

Like Fountain, Block spoke to Santillana at the commencement of her employment about the expectations of the position, including working with Colbert.  (Doc. No. 73-14 at 18.)  Block stressed that Santillana would be expected to supervise and coordinate several people, including Colbert and the independent mediators.  (*Id.*)  Block informed Santillana that she, Fountain, and Simmons had determined that the mediation department should operate as a team rather than a series of individual actors.  (*Id.*)  According to Block, Santillana understood these expectations and was given a written copy of her performance goals.  (*Id.*)  In addition, Block told Santillana at lunch on her first day of work that Colbert "was a little upset" about not being selected for an interview for Santillana's position.  (Doc. No. 73-8 at 7.)

### B.  Office Arrangement

During her first week of employment, Fountain gave Santillana a tour of the mediation department and told her that once she was "settled" and got her "feet grounded," she could arrange the office as she desired and choose an office for herself.  (Doc. No. 73-5 ¶ 15; Doc. No. 73-9 at 7.)  Although several offices were vacant, (Doc. No. 83-9 at 2), Fountain informed Santillana that one option was for her to take the corner office then occupied by Colbert.  (Doc. No. 73-9 at 7.)  Despite knowing that Colbert had applied for the Mediation Coordinator position and that Colbert recently had arm surgery, Santillana told Fountain that she "would take" Colbert's office.  (Doc. No. 73-1 at 15-16.)  According to Santillana, Fountain and Simmons asked her who was going to inform Colbert about the office change.  (*Id.* at 15.)  Santillana offered to tell Colbert, to which Simmons replied "he was glad it wasn't him because [Colbert] was difficult to deal with."  (*Id.*)

The following week, Santillana told Colbert that she wanted Colbert's office, which prompted a disagreement between Santillana and Colbert.  (Doc. No. 73-5 ¶ 15.)  Santillana testified that during a meeting of Santillana, Fountain, and Colbert to resolve the dispute, Colbert "cried and complained and said that . . . she didn't get the job and now they were taking the office away from her . . . what did they want next."  (Doc. No. 73-1 at 16.)  Fountain resolved the dispute by tabling the decision to move offices for ninety days in light of Colbert's recent arm surgery and inability to obtain the position of Mediation Coordinator.  (Doc. No. 73-5 ¶ 16; Doc. No. 73-1 at 16; Doc. No. 73-9 at 10.)  Santillana disagreed with the way Fountain handled the situation, testifying that Fountain never should have offered her a choice of office arrangements if he was simply going to sympathize with Colbert's injury and inability to obtain Santillana's position.  (Doc. No. 73-1 at 16-17.)  On the other hand, Fountain felt it was inappropriate for Santillana to have asked Colbert for

her office in light of the short time that Santillana had been mediation coordinator, the longevity of Colbert's employment, and the "feather ruffling that would come out of it."  (Doc. No. 73-9 at 8.)

### C.  Colbert's Time and Attendance

"[W]hen [Santillana] first came on board," Block instructed Santillana "to get [Colbert's] comp time under control."  (Doc. No. 73-8 at 9.)  Block explained during her deposition that Colbert had been accruing comp time for working late and through lunch when she ran the mediation department prior to Santillana's hire.  (*Id.*)  Block intended for Santillana and Colbert to "trade off" to decrease comp time and for Santillana to keep track of Colbert's comp time.  (*Id.* at 9-10.)  In addition, Block told Santillana on her first day of work that Colbert was not arriving to work on time and to "talk to her."  (Doc. No. 73-1 at 13; Doc. No. 77-6 at 3-4.)

Starting "around the second week" of her employment, Santillana began reporting problems with Colbert's time sheets to Block.  (Doc. No. 73-1 at 17.)  Santillana asserted that Colbert worked from 8:30 to 3:00 with an hour for lunch from 12:15 to 1:15 but reported 8 hours worked for November 19, 2007.  (Doc. No. 79-1 at 20.)  Colbert's unofficial time sheet, which was not signed by Santillana, reported 8 hours worked for that day.  (Doc. No. 20 at 17; Doc. No. 73-8 at 13.) Colbert's final time sheet, which was signed by both Colbert and Santillana certifying that the time sheet reflected all hours of work and leave for which Colbert was owed compensation, reported 6.5 hours worked and 1.5 comp hours for November 19.  (Doc. No. 20 at 18.)  With respect to November 20, 2007, Santillana asserted that Colbert worked from 8:30 to 3:00 but reported 8 hours worked.  (Doc. No. 79-1 at 20.)  Although Colbert reported 8 hours worked on her unofficial time sheet, her final time sheet reflected 6.5 hours worked and 1.5 hours comp time.  (Doc. No. 20 at 17-

18.)  There is no evidence of record that Colbert was not entitled to the 1.5 hours of comp time recorded on November 19 and 20.

Regarding Colbert's time for November 21, 2007, a day which Colbert took off from work, Santillana contended that Block improperly awarded Colbert five hours of straight time and one hour of sick leave.  (Doc. No. 73-1 at 23; Doc. No. 79-1 at 20.)  Santillana maintained that the five hours should have been recorded as comp time rather than straight time.  (Doc. No. 73-1 at 22; Doc. No. 79-1 at 20.)  Santillana further contended that the hour of sick leave was improperly reported because according to the Florida State Employee Handbook, which is not contained in the record, sick leave is to be used for doctor's appointments and illnesses but not to make up hours for a day requested off.  (Doc. No. 79-1 at 20.)

Santillana and Colbert came to Block's office to discuss Colbert's November 21 time entry. (Doc. No. 73-8 at 12.)  As Block regularly did with all employees, she assisted Colbert when she had difficulty calculating and entering her time.  (Doc. No. 83-8 ¶¶ 5-6.)  Block testified that Santillana was sitting "right there" when she amended Colbert's "work up time sheet" for November 21 and that Santillana uttered no objection.  (Doc. No. 73-8 at 13.)  Santillana later asked Block why she recorded five hours straight time for Colbert, to which Block replied that Colbert was allowed to keep that time "off the record" by Ron Sierra, Fountain's predecessor.  (Doc. No. 73-1 at 23; Doc. No. 73-5 ¶ 17.)  There is no evidence of record disputing this arrangement between Colbert and Sierra or suggesting that Colbert was not entitled to the time recorded on her time sheet on November 21.  Santillana further contended that Colbert's time entries for November 26-30 and December 3-6 reflected hours that Colbert did not actually work.  (Doc. No. 79-1 at 20-21; Doc. No.

20 at 18.)  However, Santillana signed Colbert's final time sheet for that time period.  (Doc. No. 20 at 18.)

Santillana also complained to Fountain about Colbert's work hours, contending that Colbert was arriving late and leaving early.  (Doc. No. 73-5 ¶ 17.)  In response, Fountain told Santillana to "deal with it because I don't want any more complaints or another investigation."  (Doc. No. 73-1 at 14.)  Santillana did not ask Fountain, and there is no evidence of record indicating, what he meant by "another investigation."  (*Id.*)

Santillana recalled that during a meeting between Fountain, Santillana, and Colbert to discuss Colbert's time and attendance, Colbert asserted that "if she'd known she was gonna have to be at work at eight thirty, she never would have taken the job."  (*Id.* at 18.)  The possibility of affording Colbert a flexible schedule for Colbert was discussed at the meeting.  (*Id.* at 36-37.)  Fountain knew that Sierra had previously permitted Colbert to have a flexible schedule to accommodate her long commute, and he relayed this information to Santillana.  (Doc. No. 73-5 ¶ 17.)  Although no agreement was reached at the meeting regarding when Colbert was required to arrive at work, Fountain, Colbert, and Santillana agreed "sometime in December 2007" that Colbert's hours would be from 8:30 to 5:00 with a half hour for lunch.  (*Id.* ¶ 20; Doc. No. 73-1 at 18-19, 37.)

With respect to Colbert's December 2007 time sheet, Santillana presented Block with a record of Colbert's work hours in support of her claim that Colbert had falsified her time.  (Doc. No. 73-8 at 15.)  Santillana asserted that Colbert reported more time than she actually worked on December 10-14, 17-18, and 20.  (Doc. No. 79-1 at 23-24.)  Upon comparing Santillana's records to Colbert's doctor appointments known to Block, Block noted that one of the times Santillana recorded Colbert away was a time where Colbert had been in Block's office getting the mail.  (*Id.*)

According to Block, Santillana said that she was "not comfortable" signing Colbert's December 2007 time sheet, so Block instructed Santillana to "work it out" with Colbert.  (Doc. No. 78-1 at 26.)  Santillana asserted that Block suggested that she credit Colbert for the 15 minutes or half-hour that she regularly overreported.  (Doc. No. 79-1 at 24.)  When Block subsequently received Colbert's final time sheet from December 2007, it was signed by Santillana.  (Doc. No. 20 at 19.)  Block maintained that Santillana brought the issue of Colbert's time to her attention with such frequency that she felt Santillana was "obsessed about [Colbert's] hours."  (Doc. No. 73-8 at 6.)

Santillana testified that Fountain told her she could not "write . . . up" Colbert for presenting her with a fraudulent time card and that Fountain refused to write up Colbert himself.  (Doc. No. 79-1 at 21.)  Although Santillana contended that the Florida State Employee Handbook provided that falsification of an attendance and leave report is grounds for disciplinary action, no provisions of the Florida State Employee Handbook are present in the record.  Further, no evidence of record suggests that Santillana or Fountain had authority to "write up" Colbert for submitting a fraudulent time card as Santillana asserted.  In any case, Santillana felt that Fountain and Block "were not supporting her," that they "were clearly playing favorites," and that "they were afraid if they took any action and held [Colbert] accountable that she would file a discrimination action against them."  (Doc. No. 79-1 at 21.)  Santillana further testified that "it was clear" she "had the title of supervisor but not the authority that went along with the title."  (*Id.*)

In contrast to Santillana's testimony, Fountain recalled that when Santillana raised the issue of Colbert's tardiness with him, he "took it seriously" and gave Santillana "some support and some muscle . . . to help her get that under control."  (Doc. No. 78-3 at 9.)  At the same time, Fountain

testified that the dispute over Colbert's working hours occurred "during a time of need that [he] had, so [he tried] to be lenient and show some compassion." (*Id.* at 7-8.)

On January 16, 2008, Block, Fountain, Santillana, and Colbert met to discuss Colbert's hours. (Doc. No. 79-1 at 24.)  According to Santillana, Block stated that Santillana was "wrong about [Colbert's] time and that [she] should back off." (*Id.*)  Santillana also recalled that Fountain informed her at the meeting that she would no longer be tracking Colbert's time. (*Id.* at 25.)  In response, Santillana told Fountain that "he was unfair and did not back me as a supervisor." (*Id.*)

### D.  Colbert's Refusal to Mediate and Meet with Santillana

On December 18, 2007, Santillana asked Colbert to mediate a small claims case because no other mediators were available and because Colbert was certified to mediate at the time. (Doc. No. 78-4 at 2.)  According to Santillana, Colbert refused to mediate and left work sick that afternoon. (*Id.*)  Santillana told Judge Marblestone that Colbert refused to mediate as she instructed, and Marblestone responded that it was "unacceptable and to report it to" Fountain.[1] (Doc. No. 73-1 at 32.)  The next day, Santillana notified Fountain by email that Colbert had refused to mediate. (Doc. No. 73-5 ¶ 21; Doc. No. 78-4 at 2.)

---

[1] Santillana's testimony about what Judge Marblestone said is hearsay if offered for the truth of the matter asserted, and no exception to the hearsay rule is shown. Fed. R. Evid. 801-03. Inadmissible hearsay contained in an affidavit or deposition generally cannot be considered on a motion for summary judgment. *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999) (citing Fed. R. Civ. P. 56(e)(1), now Fed. R. Civ. P. 56(c)(4)).  But where, as here, no party has objected to the admissibility of any hearsay testimony, all objections are deemed waived for purposes of the pending motion for summary judgment, and the otherwise inadmissible testimony may be considered by the Court in its analysis. *See Auto Drive-Away Co. Of Hialeah, Inc. v. I.C.C.*, 360 F.2d 446, 448-49 (5th Cir. 1966) (noting that in the absence of a motion to strike or other objections, defects under Rule 56(e) are waived); *see also Hope For Families & Cmty. Serv., Inc. v. Warren*, 721 F. Supp. 2d 1079, 1178 n.114 (M.D. Ala. 2010) (collecting cases); *Ali v. City of Clearwater*, 915 F. Supp. 1231, 1236 (M.D. Fla. 1996) (collecting cases).

Contrary to Santillana's version of events, Colbert maintained that she was unable to mediate the small claims case as requested by Santillana because she was overseeing family mediations at the time. (Doc. No. 83-9 at 3.) Colbert further contended that volunteer mediators were available to handle the case that Santillana requested Colbert to mediate. (*Id.*) Colbert recalled that Santillana became loud and rude, causing her to become embarrassed. (*Id.*) Colbert explained that "things had become so bad" with Santillana that she "had to take several mental health days off because [Santillana] had become unbearable." (*Id.*)

Fountain asked Block to find out from Colbert what happened, and Colbert told Block that she did not feel comfortable mediating because she had not previously been asked to mediate and had no practice doing so. (Doc. No. 73-5 ¶ 22.) According to Santillana, Fountain instructed her not to ask Colbert to mediate again and said that the Seminole County Circuit Court "would no longer pay for [Colbert's] county mediation." (Doc. No. 73-1 at 27-28.) Feeling that she was not "being backed up" by Fountain, Santillana "insisted" that Fountain call April Kopp, the Human Resources Manager for the Seminole County Circuit Court, "to get some direction on what [she] could do." (*Id.* at 32-33; Doc. No. 73-14 ¶ 1.) According to Santillana, Copp told her that she thought Colbert's "issues run deeper than just having you for a supervisor." (Doc. No. 73-1 at 33.)

On December 19, 2007, Santillana emailed Colbert requesting that they meet the following morning to go over work that Santillana performed and to request that Colbert undertake certain tasks. (Doc. No. 78-3 at 24.) Colbert responded the following morning as follows:

> I would rather not be in a close meeting with you at this time. Whatever work that you did yesterday I am sure is fine and you did a good job. I will take care of the rest of the issues listed. Thank you for respecting my wishes.

(*Id.*)  Santillana replied by stating, "Karen I respect your wishes, however there are some things we need to go over as far as work goes and we will need to communicate."  (*Id.*)  Although Colbert did not comply with Santillana's requests to mediate and meet, Santillana never approached management with a proposal to terminate or otherwise discipline Colbert due to insubordination. (Doc. No. 73-14 at 14.)

### E.  Computer Skills

Fountain instructed Colbert to train Santillana on the Foxpro computer program used to schedule mediations.  (Doc. No. 73-4 ¶ 8.)  According to Fountain, when he asked Colbert to train Santillana, Colbert "said that it seemed odd to her that she was expected to train someone who was hired over her to get the job," and Fountain interpreted this as an "expected response."  (Doc. No. 78-3 at 6.)  Although Colbert claimed to be unavailable during some of the times that Santillana wanted to meet for training, Colbert met with Santillana on several occasions to train Santillana on the Foxpro computer program.  (Doc. No. 73-4 ¶ 9; Doc. No. 73-1 at 31-32.)  When Colbert did train Santillana, Colbert noticed that Santillana needed repeated training on functions, perceived that Santillana did not grasp the concepts taught to her, and reported to Fountain that she had to "constantly retrain" Santillana.  (Doc. No. 73-4 ¶¶ 9-10.)  Colbert also recalled Santillana stating on more than one occasion that "in her previous job she had a secretary to do her work for her."  (*Id.* ¶ 11.)  According to Colbert, Santillana constantly called her to explain things, which prevented her from completing her work.  (Doc. No. 83-9 at 3.)  When Santillana repeatedly asked the same questions, Colbert at first re-answered Santillana's questions but later told Santillana to look over her notes.  (*Id.*)

Like Colbert, Fountain observed that Santillana had difficulty with computer programs and heard Santillana express on several occasions that other persons did her computer work for her at her previous job.  (Doc. No. 73-5 ¶ 14; Doc. No. 73-1 at 55.)  Similarly, Block recalled that when she was explaining the email system on her first day of work, Santillana stated, "I always had other people do this for me."  (Doc. No. 73-8 at 19.)  At one point, Fountain "lightheartedly suggested that [Santillana] get additional computer training after noticing her difficulty in using computer programs."  (Doc. No. 73-5 ¶ 14.)

The perceptions of Colbert, Fountain, and Block regarding Santillana's computer skills were also observed by computer support personnel of the Seminole County Circuit Court.  Tracy Muck, a Senior Court Technologist, testified that Santillana requested assistance from him at least twelve times with basic computing tasks, such as finding email addresses, attaching files to emails, printing, saving a file, changing font size, checking email, and sorting information in a spreadsheet.  (Doc. No. 73-11 at 4, 7-8.)  Muck recalled assisting Santillana with the same basic tasks on multiple occasions.  (*Id.* at 4.)  Muck further averred that during each support instance with Santillana, she stated that her secretary at her previous job performed computing tasks for her.  (*Id.* at 8.)  Santillana requested help so frequently for "simple tasks" and became so agitated during one incident that Muck informed Fountain of Santillana's recurring difficulty with computers.  (*Id.* at 4, 8.)

Jen Pizarro, a Technology Project Manager, also assisted Santillana on several occasions with computer issues.  (Doc. No. 73-12 ¶ 1.)  Pizarro noticed that Santillana did not seem familiar with basic computer functions such as working in Excel spreadsheets.  (*Id.* ¶ 9.) Pizarro recalled that Santillana was unable to adjust the height and width of a cell in Excel and that Santillana once

admitted to being "computer illiterate." (*Id.* ¶¶ 9-10.) Pizarro shared her observations regarding Santillana's "deficient" computer skills with Fountain. (*Id.* ¶ 11.)

Santillana maintained that except for a single excel spreadsheet referenced in her deposition where she typed over formulas and "learning [her] way around a new system," she did not encounter any difficulties using computer programs at the Seminole County Circuit Court. (Doc. No. 73-1 at 6, 55.) She further testified that she had knowledge of Microsoft Outlook, Word, and Excel. (Doc. No. 77-4 at 12.) Santillana asserted that with respect to Microsoft Outlook, she knew how to attach documents to emails and did not require any assistance with that task as the Mediation Coordinator. (*Id.* at 13.) She also professed competency in typing letters, setting up margins, and selecting printers in Microsoft Word. (*Id.* at 13-14.) Santillana further testified that she knew how to enter data in Microsoft Excel but did not know how to create formulas or macros. (*Id.* at 15-16.)

### F. Complaints by Mediators

Block testified that she received complaints from two of the independent mediators, Bill Herrman and Virginia Poynter, about Santillana. (Doc. No. 73-8 at 17.) According to Block, Herrman told her that Santillana did not treat the mediators with respect, and he was upset because Santillana implemented new procedures that disrupted the mediation process prior to grasping a complete understanding the mediation program. (*Id.* at 17-18.) Block also testified that Herrman thought Santillana did not treat Colbert with respect. (*Id.* at 18.) Block averred that Poynter reported observations similar to those of Herrman. (Doc. No. 73-14 at 19; Doc. No. 77-4 at 2.)

Herrman testified during his deposition that he spoke to Block about Santillana prior to her termination, but he could not recall the substance of that conversation. (Doc. No. 78-2 at 17-18.) Herrman asserted that he was not present when Santillana made any adverse comments "against or

to" Colbert, (*id.* at 16), and that he did not recall ever noticing that Santillana was disrespectful to mediators. (*Id.* at 18.)

Although Poynter testified during her deposition that she never saw Santillana treat mediators with disrespect, (Doc. No. 78-2 at 7), she also explained that she had several problems with Santillana due to her lack of knowledge about family mediation. (*Id.* at 4-5.) Poynter asserted that despite Santillana insisting that mediators come to her first with any issues, Santillana was not familiar with income deduction orders, did not know how to bill parties for a second mediation session, and did not know how to access the mediation calendar on the computer. (*Id.* at 5-6.) Poynter also recalled that Santillana would at times say negative things about Colbert outside Colbert's presence, "such as she wasn't running the program well." (*Id.* at 10.)

### G.  Culmination of Conflicts

Fountain contended that Santillana's complaints to him regarding Colbert "grew excessive" and concerned problems "ranging from time and attendance, to tone of voice." (Doc. No. 73-5 ¶ 18.) Consistent with Fountain's averment, Santillana testified that she complained to Block and Fountain around the second week of her employment about Colbert's "abrupt" attitude. (Doc. No. 73-1 at 29.) Santillana also admitted to complaining to Fountain about the abusive and combative manner in which Colbert dealt with volunteer mediators. (Doc. No. 73-1 at 42.) On the other hand, both Fountain and Block asserted that they never received any complaints from Santillana or others that Colbert could not perform the substantive duties of her position. (Doc. No. 73-5 ¶ 25; Doc. No. 73-8 at 20.) Notwithstanding, Fountain encouraged Santillana "to patiently work through these issues with Colbert" and asked Colbert "to try to work with her new supervisor." (Doc. No. 73-5 ¶ 19.)

Fountain maintained that despite his attempt to resolve their conflicts, Santillana and Colbert continued to have problems with one another.  (*Id.* ¶ 23.)  Colbert came to Fountain's office "on many occasions" to complain about Santillana and cry, and Fountain once permitted Colbert to go home early because she was so upset.  (Doc. No. 78-3 at 9-10, 15.)  Similarly, Santillana came to Fountain's office on "many occasions" to express concerns and frustrations about working with Colbert, and one on occasion Santillana broke down crying.  (*Id.* at 9.)  Fountain stated that Santillana's frequent visits to his office regarding the same issues involving Colbert "disrupted the work of Court Administration."  (Doc. No. 73-5 ¶ 24.)

Fountain also perceived that Santillana "seemed incapable of resolving any problems on her own."  (*Id.*)  On one occasion, Santillana emailed Fountain, requesting that he "double check" to make sure that a particular type of colored folder was the same type of folder that Colbert was using at the time.  (Doc. No. 73-1 at 8, 56-57.)  Santillana testified that she made this request to her supervisor because it was responsive to Fountain's request to look for budget cuts.  (*Id.* at 9.)  Santillana further explained that she assumed Fountain would want to know everything that she did because that is how her supervisor in a previous position operated.  (*Id.* at 8-9.)

In mid-January 2008, Fountain met with Santillana, Colbert, and Block to discuss the problems they were having.  (Doc. No. 73-5 ¶ 26.)  Fountain recalled that during the meeting, Santillana "jumped out of her seat and yelled, 'I guess that means I can do anything I want to around here,' and stormed out of the room."  (*Id.*)  At this point, Fountain realized that Santillana was not interested in working through issues with Colbert and "recommended to his supervisor that we discuss her termination."  (*Id.*)  Fountain also noted that Santillana "lacked the necessary computer and managerial skills to do her job as Mediation Coordinator."  (*Id.* ¶ 27.)

Fountain recommended to both Mark VanBever, the trial court administrator who was Fountain's direct supervisor, and Simmons that Santillana be terminated.  (*Id.* ¶¶ 6, 29.)  According to Fountain, VanBever, Simmons, and the "Hiring Committee," the members of which were not specified in the record, agreed with his recommendation.  (*Id.* ¶ 29; Doc. No. 78-3 at 16.)  Fountain maintained that in recommending Santillana's termination, he did not make a choice between her and Colbert, and race was not a factor.  (Doc. No. 73-5 ¶ 28; Doc. No. 78-3 at 16.)

On January 22, 2008, Santillana was called into Block's office.  (Doc. No. 73-1 at 11.) Santillana testified that upon walking into Block's office, Fountain informed her that she "wasn't a good fit" and "didn't have management skills" or "computer skills."  (Doc. No. 73-1 at 12, 43.) Block told Santillana that "it wasn't just a decision made by the two of us but by the committee." (Doc. No. 78-3 at 13.)  Block averred that she, Fountain, and Simmons determined that Santillana would be terminated.  (Doc. No. 77-4 at 6.)  However, Block later testified during her deposition that she did not participate in the decision to terminate Santillana.  (Doc. No. 73-8 at 19.)

Block asked Santillana to sign a letter typed by Block resigning her position, or else be terminated.  (Doc. No. 73-1 at 10-11.)  Santillana left Block's office for approximately fifteen minutes to call her attorney and then returned to Block's office to sign the letter of resignation.  (*Id.* at 12.)  Block recalled in a memorandum that she offered Santillana the opportunity to write her own letter of resignation but Santillana instead chose to sign the letter prepared by Block.  (Doc. No. 78-3 at 13.)  After Santillana resigned, she was placed on administrative leave for four weeks.  (Doc. No. 73-1 at 12.)  Santillana conceded during her deposition that at no time did Block, Fountain, or Simmons say anything to her about her race or Colbert's race.  (*Id.* at 39-40.)

### H. Involvement of Simmons

Simmons testified that during the time period relevant to this case, he had delegated all personnel decisions to VanBever.  (Doc. No. 73-3 at 5, 9, 12.)  Simmons explained that he previously "had gotten tired of having employees in my office crying" and being "enmeshed in the personnel business."  (Doc. No. 78-4 at 7-8.)  Santillana could not "say for sure" whether she reported any of Colbert's behavior to Simmons, and she admitted to having no personal knowledge about whether Simmons instructed Colbert to train her, whether Simmons approved or knew about Colbert's time sheets, or whether Simmons was informed of Colbert's refusal to mediate.  (Doc. No. 73-1 at 24, 26-27, 29-30.)

Simmons testified that he learned from Fountain that there was "friction" between Colbert and Santillana which required "an inordinate amount" of Fountain's time and that "it wasn't working" between Colbert and Santillana.  (Doc. No. 73-3 at 11.)  Simmons asserted that after Santillana had been working "a while," Fountain told him that "basically it was a daily event where either [Santillana] or [Colbert] or sometimes both . . . complain[ed] about the things going on in the mediation department."  (Doc. No. 78-4 at 8.)  Simmons perceived that "Fountain spent a lot of time trying to soothe those troubled waters."  (*Id.* at 8-9.)  Simmons learned from Fountain that some of the mediators complained about Santillana, (*id.* at 11), and at some point Simmons "became aware" of Santillana's allegations that Colbert had falsified time sheets.  (Doc. No. 73-3 at 9.)  Simmons also heard "idle gossip" that Santillana had been "drinking or something at a party," but he "discounted it because it didn't jibe with what [he] knew about [Santillana] . . . and . . . it didn't matter."  (Doc. No. 78-4 at 12.)

Simmons testified that the "final decision" to terminate Santillana was made between Fountain and VanBever and that the "ultimate responsibility" belonged to VanBever.  (Doc. No. 73-3 at 9, 12.)  Fountain told Simmons that he spoke to VanBever, and a decision to terminate Santillana had been made.  (*Id.* at 11.)  Simmons responded by saying that it was Fountain's "call." (*Id.*)  Simmons explained that Fountain advised him of the decision to terminate Santillana "purely [as] a courtesy advisement" and that Fountain and VanBever did not ask for his permission to terminate Santillana because it was not required.  (Doc. No. 78-4 at 22.)

Contrary to Simmons' testimony that he was not involved in the decision to terminate Santillana, Judge Alan Dickey, who at the time of Santillana's termination served as the Administrative Judge of the Family Division of the Seminole County Circuit Court, provided testimony that Simmons participated in the decision to terminate Santillana.  (Doc. No. 78-4 at 14.) According to Dickey, Simmons told him that "he had made the decision that Ms. Santillana should be terminated" and that Santillana was terminated because she could not "get along" with Colbert or others in Court Administration.  (*Id.* at 14.)  Dickey further recalled Simmons stating that "he felt that Ms. Santillana's alleged social activities were not appropriate for a representative of the judiciary" and that "she had talked about a particular evening where she had gone out to a lounge and had too much to drink and was 'partying.'"  (*Id.* at 15.)  Simmons denied telling anybody about Santillana's drinking or partying.  (*Id.* at 18-19.)

## I.  Subsequent Mediation Coordinator - Melissa Notaro

Melissa Notaro, who is white, succeeded Santillana as Mediation Coordinator and served in that position from April 21, 2008 until March 1, 2010.  (Doc. No. 73-6 ¶¶ 2, 4.)  Notaro met with Fountain and Block on February 1, 2008, prior to accepting the position of Mediation Coordinator.

(Doc. No. 77-2 at 4.)  At this meeting, Fountain and Block told Notaro that her predecessor "hadn't worked out" and that if she chose to accept the position, she would be supervising Colbert.  (*Id.*)  Fountain and Block further explained that working with Colbert would be "challenging" but that Colbert was "very knowledgeable."  (*Id.*)

When Notaro first began working as the Mediation Coordinator, her relationship with Colbert "seemed fine," but then became "progressively difficult" and later "seemed to just go up and down . . . like a roller coaster."  (*Id.* at 7.)  Notaro explained that "some days were fine and some days [were] just awful."  (*Id.*)  In the beginning, Notaro "shadowed" Colbert and asked her to explain her job and teach her everything that she did.  (*Id.* at 5.)  Notaro felt she could not supervise Colbert unless she knew exactly what Colbert did.  (*Id.*)  Notaro testified that Colbert trained her on the Foxpro computer program "to a certain extent" and that she learned the rest of the program on her own.  (*Id.* at 8.)  Notaro recalled that in training sessions with Colbert, she provided "just enough information . . . to get by, just what I was asking but never more."  (*Id.*)

Notaro maintained that her working relationship with Colbert began to strain within the "first couple of months" whenever she tried to exert herself as Colbert's supervisor.  (*Id.* at 8-9.)  Notaro testified that Colbert "always was resentful of any . . . suggestion . . . or request that I might have had."  (*Id.* at 9.)  Notaro also stated that "[a]nything that would sound supervisory, [Colbert] didn't seem to like and she always fought against that."  (*Id.*)  Notaro elaborated as follows:

> I found [Colbert] to be very pleasant and easy to get along with when we were not working technically when we were just maybe discussing life and children, but when it got down to work, she was hostile, downright hostile to me.  If I tried to address any concerns that I had with, maybe if I had a better idea on how to organize files or if I had a better idea on how to utilize the office space, any change that I tried to make, she did not like and she would immediately become hostile towards me and tell me that . . . was wrong, that she was going to talk to [Fountain] about it and that she didn't like what I was doing and that she knew more about the mediation

program than I did and that I needed to listen to her because she had more knowledge about it than me and I needed to sit down and listen to her.

So her treatment of me was just in my mind disrespectful. I would never speak to my supposed supervisor in that way. She never gave me the chance to be her supervisor. . . . . I don't feel that I was ever disrespectful to her or tried to be overbearing. I was really trying to learn the job and I counted on her almost to train me.

(*Id.* at 17-18.)

Notaro testified that although she "constantly" brought her concerns to Fountain's attention, Fountain explained that Colbert knew the mediation program "backwards and forwards" and was "manageable." (*Id.* at 18.) Notaro perceived that Colbert "needed to feel that she was in control." (*Id.*) At the same time, Notaro averred that "[w]hile [she] encountered certain difficulties in working with Ms. Colbert, [she] did not find her incapable of performing her job." (Doc. No. 73-6 ¶ 6.) Notaro further stated that Colbert "was highly proficient in the Foxpro program, knowledgeable about all aspects of the family mediation program, and proficient in the civil mediation program." (*Id.* ¶ 7.)

In response to Colbert's reaction to Notaro's supervisory conduct, Notaro limited her interaction with Colbert to email so that there would be a written record of any exchanges. (Doc. No. 77-2 at 10.) Notaro explained several of these emails during her deposition. On August 11, 2008, Notaro emailed Fountain to notify him that Colbert and Leanne Levett, one of the mediators, had scheduled a meeting with Simmons without Notaro's knowledge to discuss how the mediation department would accommodate mediation for the burgeoning number of foreclosure cases. (*Id.* at 12-13; Doc. No. 77-3 at 8.) Notaro sent a similar email to Fountain on August 26, 2008, regarding mediations being set up by Colbert and Herrman "without [her] knowledge or invitation . . . making

[her] look incompetent."  (Doc. No. 77-3 at 9.)  Fountain responded to Notaro by denying that Simmons was having such meetings.  (Doc. No. 77-2 at 16.)

Notaro explained that Fountain, Block, and Simmons "were trying to treat [her] as [Colbert's] supervisor" but their actions "were not such because they seemed to always go to [Colbert] to ask how things should be handled" without Notaro's presence or input.  (*Id.* at 14.) According to Notaro, she "was never accepted" as Colbert's supervisor "by anyone."  (*Id.*)  Notaro further testified that Herrman and Poynter were among the mediators that had "close[] relationships" with Colbert and would go to Colbert with almost all concerns.  (*Id.* at 9-10.)  Herrman explained that because most of the day-to-day operations were handled by Colbert, he went to Colbert when he had questions.  (Doc. No. 78-2 at 18.)

Several of Notaro's emails concern requests to Fountain to move Colbert's office and to rearrange the configuration of the mediation department.  (Doc. No. 77-3 at 13-14.)  Shortly after Notaro began working as the Mediation Coordinator, she asked Fountain for Colbert's office, and Fountain replied, "you'll never get her out of there."  (*Id.* at 3.)  According to Notaro, Fountain reconfigured the mediation department and moved the offices of Notaro and Colbert several times during Notaro's tenure "so as to not upset the situation."  (*Id.* at 2.)

In response to an unidentified mediator "consistently questioning why she didn't have as many mediations as everyone else," Notaro ran a report showing the percentage of time slots filled by Colbert for each mediator and emailed Colbert the results with a request to "spread out" mediation opportunities "as much as possible."  (Doc. No. 77-2 at 20; Doc. No. 77-3 at 12.) According to Notaro, Colbert did not make any changes in response.  (Doc. No. 77-2 at 20.)

On October 16, 2008, Notaro emailed Fountain and Block regarding Colbert's time and attendance. (Doc. No. 77-3 at 14.) Notaro informed Fountain and Block that Colbert was arriving at 8:45 instead of 8:30 as she was permitted due to her long commute and that Colbert was not giving Notaro advanced notice of her time off, which forced Notaro to reschedule a doctor's appointment. (*Id.*) In response, Block emailed Notaro that she should not change her doctor's appointment and that Colbert would have to work on the day she planned to take off due to not requesting prior approval from Notaro. (*Id.* at 15.) However, Notaro had already rescheduled her doctor's appointment at the time of Block's email and did not make Colbert cancel her time off to avoid a conflict. (Doc. No. 77-2 at 25.) Fountain also responded to Notaro's email by requesting that Notaro record Colbert's actual work hours. (Doc. No. 77-2 at 26; Doc. No. 77-3 at 16.) When Colbert's punctuality did not improve, Fountain and Block met with Colbert, and Colbert signed a Performance Improvement Plan on October 28, 2008, requiring corrective actions including following the proper chain of command, arriving on time, and requesting supervisory approval for time off. (Doc. No. 77-3 at 18; Doc. No. 83-8 at 12.)

Notaro was eventually transferred to a different position, which was documented as a demotion on her record, but by her own admission, made her much happier. (Doc. No. 83-4 at 5.) She kept the same salary and did not lose any benefits upon being demoted. (*Id.*)

## II.  Procedural History

On April 29, 2010, Santillana filed an Amended Complaint consisting of the following counts: (1) racial discrimination in violation of 42 U.S.C. § 1983 against the Seminole County Circuit Court, Fountain, Block, and Simmons; (2) negligent supervision against the Seminole County Circuit Court, Fountain, Block, and Simmons; (3) denial of equal protection in violation of

42 U.S.C. § 1983 against Fountain, Block, and Simmons; and (4) civil conspiracy against Fountain, Block, and Simmons.  (Doc. No. 20.)  On June 4, 2010, the Court entered an Order on Defendants' Motion to Dismiss Amended Complaint, (Doc. No. 21, filed May 10, 2010), dismissing Counts II and III in their entirety and dismissing the discrimination against the Seminole County Circuit Court in Count I.[2]  (Doc. No. 23.)  Thus, the only claims that remain pending are the racial discrimination claims in Count I and the civil conspiracy claims in Count IV against Block, Fountain, and Simmons.

Defendants now move for summary judgment on all remaining claims.  (Doc. No. 73.) Plaintiff has filed a Response in Opposition, (Doc. No. 77), and Defendants have filed a Reply to the Response.  (Doc. No. 83.)

**Standard of Review**

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is "material" under the applicable substantive law if it might affect the outcome of the case.  *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact

---

[2] Although the Court reasoned in the body of its Order dated June 4, 2010, that the discrimination claim against the Seminole County Circuit Court in Count I was subject to dismissal pursuant to the Eleventh Amendment to the United States Constitution, the Court omitted the dismissal of this portion of Count I from the conclusion of the Order.  (*Compare* Doc. No. 23 at 6-7, *with id.* at 13.)  No party has requested clarification of this matter, and based on the submissions of the parties on the instant Motion, it appears that all parties acknowledge the Court's dismissal of the discrimination claim against the Seminole County Circuit Court in Count I pursuant to the Order of June 4, 2010.

to find for the nonmoving party. *Id.* at 1260.  The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.  The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, the court must not grant summary judgment. *Id.*  On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations," summary judgment for the movant is "not only proper but required." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

**Analysis**

## I. Count I: Racial Discrimination by Block, Fountain, and Simmons

In Count I of the Amended Complaint, Santillana alleges that Block, Fountain, and Simmons terminated her on the basis of race in violation of 42 U.S.C. § 1983.  (Doc. No. 20 at 8-9.) Defendants argue that they are entitled to summary judgment because: (1) Santillana cannot

establish a prima facie case of discrimination; (2) the legitimate, non-discriminatory reasons for terminating Santillana were not pretextual; and (3) each of the Defendants is entitled to qualified immunity.  (Doc. No. 73 at 12-22.)  The Court agrees on all three grounds.[3]

In order to withstand a motion for summary judgment on a Section 1983 race discrimination claim, Santillana must establish a prima facie case of discrimination as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a section 1983 claim of race or gender discrimination are the same as the elements of a Title VII disparate treatment action." (citing *Cross v. Alabama*, 49 F.3d 1490, 1507-08 (11th Cir. 1995))).  "[A] plaintiff can establish a prima facie case [of race discrimination] by showing: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) she was qualified for the job or job benefit at issue."  *Id.* at 842-43 (citing *Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997)).  Once a prima facie case is shown:

> the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection.  The explanation provided must be legally sufficient to justify a judgment for the defendant.  If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. . . .

---

[3] Defendants further argue that they are entitled to summary judgment because there is no causal connection between each of the Defendants and the alleged discrimination.  (Doc. No. 73 at 18-20.)  This argument is without merit, as the evidence of record viewed in the light most favorable to Santillana shows that Block, Fountain, and Santillana each participated in the decision to terminate Santillana.  (Doc. No. 77-4 at 6; Doc. No. 78-3 at 13; Doc. No. 78-4 at 14); *see Bryant v. Jones*, 575 F.3d 1281, 1300 (11th Cir. 2009) (noting that liability under Section 1983 extends to persons "with the power directly to affect the terms and conditions of the plaintiff's employment").

> ... [The plaintiff] now must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Id.* at 843 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981)).

As discussed below, Defendants are entitled to summary judgment on the discrimination claim asserted in Count I because Santillana has failed to produce evidence showing that she was qualified for her position and that she was treated differently than a similarly situated comparator outside her protected class, two elements of the prima facie case of discrimination. Further, even if the evidence makes out a prima facie case of discrimination, Defendants are entitled to summary judgment because their legitimate, non-discriminatory reasons for terminating Santillana are not pretextual or, alternatively, because Defendants are entitled to qualified immunity.

## A.  Whether Santillana Was Qualified for Her Position

Defendants argue that Plaintiff cannot establish that she was qualified for the position of Mediation Coordinator because she lacked necessary computer skills and was incapable of working independently. (Doc. No. 73 at 13-14.)  Santillana asserts in response that she was qualified for the position based on her college degree, ten years of experience in the development of the Volusia County Teen Court Program, and her qualifications provided to Block after her initial interview. (Doc. No. 77 at 12.)  Santillana further contends that she had some computer experience and that she was dependent on Colbert to learn the Foxpro computer program.  (*Id.*)

To show she was qualified to be the Mediation Coordinator, Santillana must produce evidence demonstrating that she "satisfied [her] employer's objective qualifications." *Vessels v.*

*Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005).  Objective qualifications are limited

to those qualifications that may be established by "evidence that is objectively verifiable and either

easily obtainable or within the plaintiff's possession."  *Id.*  On the other hand, "subjective

evaluations play no part in the plaintiff's prima facie case [and] are properly articulated as part of

the employer's burden to produce a legitimate race-neutral basis for its decision, then subsequently

evaluated as part of the court's pretext inquiry."  *Id.* (citations omitted).

A job advertisement may reveal the objective skills required for a particular position.  *E.g.*,

*Green v. Staples, Inc.*, No. 6:08-cv-2034-Orl-28DAB, 2010 WL 3189810, at *5 (M.D. Fla. Aug. 11,

2010).  The job advertisement for the position of Mediation Coordinator specified, among other

requirements, the "[a]bility to work independently, establish priorities and define program goals"

and the "[a]bility to operate a personal computer and proficient use of necessary software

applications (Microsoft Outlook, Word, Excel, and Access)."  (Doc. No. 73-1 at 53.)

Because Santillana's abilities to work independently and operate software proficiently are

objectively verifiable through her actions, those skills are properly considered as part of the prima

facie case of discrimination.  *See, e.g.*, *MackMuhammad v. Cagle's Inc.*, 379 F. App'x 801, 804

(11th Cir. 2010) (finding that the plaintiff failed to show that he was objectively qualified for the

position because he had no prior work experience in a relevant field or supervising hundreds of

employees and because the employer determined that the plaintiff was unable to perform

satisfactorily the supervisory duties required by the position, despite being afforded an opportunity

to show that he could); *Greer v. Birmingham Beverage Co. Inc.*, 291 F. App'x 943, 945 (11th Cir.

2008) (finding that the plaintiff was not objectively qualified because he lacked the requisite

attention to detail as shown by his numerous problems in his current position, had limited previous

management experience, and had no experience with grocery stores); *Vessels*, 408 F.3d at 768 (considering as objective criteria the requisite education, years of experience, and state certification levels required for a particular position, while noting that an employer's claim that the plaintiff was unqualified because he lacked the preferred leadership style and "could not provide a seamless transition" were subjective criteria). Because undisputed evidence of record shows that Santillana lacked the ability to work independently and to proficiently use Microsoft Outlook, Word, and Excel, Santillana fails to meet her burden of showing that she was qualified for the position of Mediation Coordinator.

### 1. Work Independently

Defendants argue that Santillana demonstrated an inability to work independently by seeking "from the first hint of a problem" the assistance of Fountain and Block to resolve issues involving Colbert. (Doc. No. 73 at 13.) The evidence of record viewed in the light most favorable to Santillana reasonably permits no contrary finding.

As part of her responsibility to supervise Colbert, (Doc. No. 73-5 ¶ 13; Doc. No. 78-4 at 10; Doc. No. 73-14 at 18), Santillana was tasked with getting Colbert's comp time under control and talking to Colbert about arriving to work on time. (Doc. No. 73-8 at 9; Doc. No. 73-1 at 13; Doc. No. 77-6 at 3-4.) There is no evidence of record that Santillana remedied or attempted to remedy any of Colbert's time and attendance problems without the assistance of Block and Fountain. Santillana conceded that by the second week of her employment as Mediation Coordinator, she brought Colbert's time and attendance issues to the attention of Block and requested Block's assistance. (Doc. No. 73-1 at 17.) Santillana told Block that she was "not comfortable" signing Colbert's December 2007 time sheet, but after being instructed to "work it out" with Colbert,

Santillana signed the time sheet.  (Doc. No. 78-1 at 26; Doc. No. 20 at 19.)  Santillana complained to Block about Colbert's time and attendance with such frequency that Block felt Santillana was "obsessed about [Colbert's] hours."  (Doc. No. 73-8 at 6.)  Similarly, despite meeting with Block, Colbert, and Santillana on at least two occasions to discuss Colbert's time and attendance, (Doc. No. 73-1 at 18-19; Doc. No. 79-1 at 24-25), Fountain recalled that Santillana's reports to him about Colbert's time and attendance on multiple occasions per week "grew excessive."  (Doc. No. 73-5 ¶ 18.)  Further, at the meeting on January 16, 2008, Fountain and Block informed Santillana that she would no longer be tracking Colbert's time, and in response, Santillana told Fountain that he "was unfair."  (Doc. No. 79-1 at 25.)  Based on this unrefuted evidence, Santillana failed to independently address Colbert's time and attendance issues.

Santillana's inability to work independently was further demonstrated by the manner in which she attempted to obtain Colbert's office.  It is undisputed that Fountain told Santillana during the first week of her employment that once she was "settled" and got her "feet grounded," she could arrange the office as she desired and choose an office for herself.  (Doc. No. 73-9 at 7; Doc. No. 73-5 ¶ 15.)  Despite being warned that Colbert was "very entrenched in her ways," (Doc. No. 73-9 at 5), and knowing that Colbert had applied for her job and had recently undergone arm surgery, Santillana told Fountain that she "would take" Colbert's office.  (Doc. No. 73-1 at 15-16.)  The following week, Santillana told Colbert that she wanted her office, which prompted a disagreement between Santillana and Colbert.  (Doc. No. 73-5 ¶ 15.)  There is no evidence of record that Santillana independently attempted to resolve this dispute with Colbert.  Fountain ultimately resolved the dispute by tabling the decision to move offices for ninety days.  (Doc. No. 73-1 at 16; Doc. No. 73-5 ¶ 16; Doc. No. 73-9 at 10.)

In another instance, Santillana emailed Fountain, requesting that he "double check" to make sure that a particular type of colored folder was the same type of folder that Colbert was using at the time. (Doc. No. 73-1 at 8, 56-57.) Santillana testified that she made this request to her supervisor because it was responsive to Fountain's request to look for budget cuts. (*Id.* at 9.) Santillana conceded that she did not ask Fountain for clarification about whether such a request should be directed to him, as she assumed Fountain would want to know everything that she did because that was how her previous supervisor operated. (*Id.* at 8-9.)

Santillana also demonstrated an inability to work independently through her complaints to Fountain and Block about Colbert's attitude. Santillana complained to Block and Fountain around the second week of her employment about Colbert's "abrupt" attitude, and she subsequently complained to Fountain about the abusive and combative manner in which Colbert dealt with volunteer mediators and Colbert's tone of voice. (Doc. No. 73-1 at 29, 42; Doc. No. 73-5 ¶ 18.) Santillana does not assert, and the Court does not find, any evidence of attempts by Santillana to resolve these problems without involving Block or Fountain.

Fountain encouraged Santillana "to patiently work through . . . issues with Colbert" and asked Colbert "to try to work with her new supervisor." (Doc. No. 73-5 ¶ 19.) Despite Fountain's attempts to resolve their conflicts, Santillana and Colbert continued to have problems with one another. (*Id.* ¶ 23.) Both Santillana and Colbert came to Fountain's office to complain about each other, sometimes to the point of crying. (Doc. No. 78-3 at 9-10; Doc. No. 78-3 at 15.) Fountain stated that Santillana's frequent visits to his office regarding the same issues involving Colbert "disrupted the work of Court Administration," and Fountain observed that Santillana "seemed incapable of resolving any problems on her own." (Doc. No. 73-5 ¶ 24.)

In light of the numerous, unrefuted incidents reflecting Santillana's inability to independently manage Colbert and the resulting disruptive effect on court administration, Santillana was not qualified for the position of Mediation Coordinator due to her inability to work independently. *See Daniels v. Hale*, 350 F. App'x 380, 385 (11th Cir. 2009) (finding that an employee was not qualified for the dispatching job from which she was terminated in light of numerous objective evaluations indicating that the plaintiff had difficulty communicating and handling phone calls, which were skills required by the applicable job description, and because the plaintiff received continuing complaints about her job performance).

### 2. Proficient Use of Microsoft Outlook, Word, and Excel

In response to Defendants' argument that she lacked proficiency in Microsoft Outlook, Word, and Excel, Santillana points to her ten years experience administering the Volusia County Teen Court program.  (Doc. No. 77 at 12.)  However, there is no evidence of record indicating Santillana's computer experience drawn from that position, and by her own unrefuted admissions to Block, Fountain, and Muck, others performed much of Santillana's computer work at her prior job.  (Doc. No. 73-5 ¶ 14; Doc. No. 73-1 at 55; Doc. No. 73-8 at 19; Doc. No. 73-11 at 8.)

Santillana's interaction with the computer support personnel of the Seminole County Circuit Court further demonstrates her inability to proficiently use Microsoft Outlook, Word, and Excel. Tracy Muck testified that on at least a dozen occasions, he was summoned to Santillana's office to assist her with "simple tasks" such as finding email addresses, attaching files to emails, printing, saving a file, changing font size, checking email, and sorting information in a spreadsheet.  (Doc. No. 73-11 at 4, 7-8.)  Similarly, Jen Pizarro recalled that Santillana did not seem familiar with basic computer functions such as working in Excel spreadsheets, that Santillana was unable to adjust the

height and width of a cell in Excel, and that Santillana once remarked that she was "computer illiterate."  (Doc. No. 73-12 ¶¶ 9-10.)

Santillana presented no evidence disputing the instances of computer support recalled by Muck or Pizarro or plausibly suggesting that the computer support they provided concerned issues beyond "simple tasks" in Microsoft Outlook, Word, and Excel.  (Doc. No. 73-11 at 8.)  According to Block, notwithstanding "an acclimation period to learn department-specific software applications," Santillana's "inability to use programs like Microsoft Word, Excel, Outlook, and Internet Explorer was shocking."  (Doc. No. 77-4 at 6.)  Similarly, Fountain testified that Santillana was not asked during her interview for the position whether she had the ability to use Microsoft Word, Excel, Outlook, and Internet Explorer, as it was assumed that a person with her background would possess these "basic computer skills."  (Doc. No. 78-3 at 15-16.)

Santillana testified during her deposition that she "had knowledge of how to use" Microsoft Outlook, Word and Excel when she began working as the Mediation Coordinator, (Doc. No. 77-4 at 12), and that she encountered limited difficulties in using computer programs at the Seminole County Circuit Court.  (Doc. No. 73-1 at 6.)  Even presuming these assertions as true, *Anderson*, 477 U.S. at 255, it cannot reasonably be concluded that Santillana was *proficient* in the use of Microsoft Outlook, Word, and Excel, as she frequently requested support from Muck and Pizarro for simple tasks and admitted several times that others at her previous job performed the computing tasks required of the Mediation Coordinator.  Because proficiency, not merely knowledge, of Microsoft Outlook, Word, and Excel was required of the Mediation Coordinator, (Doc. No. 73-1 at 53), Santillana failed to meet this job qualification.

In summary, because Santillana lacked the ability to work independently or proficiently use Microsoft Outlook, Word, or Excel, she was not qualified for the position of Mediation Coordinator, and summary judgment should be granted for Defendants. *See Greer*, 291 F. App'x at 945 (affirming summary judgment for the defendant on a race discrimination claim because the plaintiff failed to show that he was qualified for the position at issue).

## B. Disparate Treatment of Similarly Situated Comparator

The parties dispute whether Santillana and Colbert were similarly situated. (Doc. No. 73 at 14-16; Doc. No. 77 at 13.) As part of the prima facie case, "the plaintiff must show that [her] employer treated similarly situated employees outside [her] classification more favorably than herself." *Holifield*, 115 F.3d at 1562 (citing *Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995)). "To make a comparison of the plaintiff's treatment to that of [other] employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects." *Id.* (citations omitted). "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citing *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)).

In view of the disparate job duties of Santillana and Colbert and Santillana's undisputed conduct cited by Defendants as grounds for her termination, Colbert and Santillana are not similarly situated. It is undisputed that Santillana was Colbert's supervisor, (Doc. No. 73-5 ¶ 13; Doc. No. 78-4 at 10; Doc. No. 73-14 at 18), and that Santillana and Colbert had different positions and work duties. Colbert's job duties as a Court Program Specialist II included communicating with attorneys and parties to schedule family law mediations, entering case information into the Foxpro database,

billing parties for mediations, appearing and testifying at show cause hearings when parties have not paid for mediation, and keeping statistics on mediated cases. (Doc. No. 73-4 ¶¶ 1, 5.) In contrast, as Mediation Coordinator, Santillana's responsibilities included supervising Colbert, overseeing the scheduling of mediations, tracking and compiling data related to the number of mediations conducted and the cost of the mediations, generating monthly statistical reports regarding the mediations, and maintaining a database consisting of scheduling and case-specific information related to mediations. (Doc. No. 73-5 ¶ 13; Doc. No. 33-4 at 51.) Santillana was also tasked with getting Colbert's "comp time under control" and speaking to Colbert about arriving on time. (Doc. No. 73-8 at 9; Doc. No. 73-1 at 13; Doc. No. 77-6 at 3-4.)

Where adverse employment action is taken against the plaintiff due to actions also taken by another person governed by the same relevant employment policy, the job titles and responsibilities of the plaintiff and the comparator need not be similar. *See, e.g.*, *Lathem v. Dep't of Children and Youth Servs.*, 172 F.3d 786, 792-93 (11th Cir. 1999) (finding that the plaintiff and her supervisor were similarly situated because both committed the same misconduct and were governed by the same employment policy under which the plaintiff was terminated). Here, however, Santillana has produced no evidence showing that Colbert's conduct was similar to that of Santillana or that Colbert, like Santillana, was required to have the same management and computer skills identified as the basis for Santillana's termination. (Doc. No. 73-1 at 12, 43.)

Santillana argues that despite being Colbert's supervisor, she "was put on an equal plane" with Colbert and was not allowed to supervise or discipline Colbert. (Doc. No. 77 at 13.) Santillana does not cite, and the Court does not find, any authority suggesting that this treatment permits a finding that Santillana and Colbert were similarly situated "in all relevant respects." *Holifield*, 115

F.3d at 1562. In any case, Santillana has not produced any evidence that she was inhibited from exercising her authority as Mediation Coordinator to supervise Colbert. Although Fountain prohibited Santillana from writing up Colbert for presenting Santillana with a fraudulent time card, (Doc. No. 79-1 at 21), there is no evidence of record that Santillana had the authority to take such action with or without Fountain's approval. Because Santillana was terminated for failure to adequately perform the duties of her position and because Santillana and Colbert had different work duties and conducted themselves differently, Santillana and Colbert are not similarly situated for purposes of establishing a prima facie case of discrimination. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) ("[T]he quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.").

Having found that Colbert and Santillana are not similarly situated, any differences in the application of workplace rules to Colbert and Santillana do not permit an inference of discrimination. *See Lathem*, 172 F.3d at 793 ("If two employees are not 'similarly situated,' the different application of workplace rules does not constitute illegal discrimination."). However, even if Santillana and Colbert were similarly situated, Santillana has failed to produce any evidence showing Colbert was treated more favorably than her. *Holifield*, 115 F.3d at 1562. Although Santillana argued that "Colbert was allowed to do things that [she] wasn't allowed to do," (Doc. No. 77 at 13-14), Santillana failed to show that a privilege given to Colbert was not available to her. Like Colbert, Santillana was authorized to arrive late on occasion, (Doc. No. 73-1 at 35-36; Doc. No. 83-8 at 10), and Santillana earned and used compensatory time. (Doc. No. 83-8 at 7-8.) Further, Santillana never asked for a flexible schedule as was afforded Colbert upon her request, and

no evidence of record indicates that Santillana was precluded from making such a request.  (Doc. No. 73-1 at 18, 36; Doc. No. 73-5 ¶ 17.)  Although Fountain permitted Colbert to leave early one day because she was upset, there is no evidence of record that Santillana was equally upset and denied permission to go home early.  (Doc. No. 78-3 at 9-10, 15.)  Despite Colbert's rudeness and insubordination to both Santillana and Notaro, (Doc. No. 78-4 at 2; Doc. No. 78-3 at 24; Doc. No. 77-2 at 8-9, 17-18, 20), Santillana does not identify, and the Court does not find, any evidence of record that Santillana was similarly insubordinate or rude, let alone that she was treated differently than Colbert for such conduct.  Accordingly, there is no evidentiary support for Santillana's contention that Colbert was afforded preferential treatment.

Notwithstanding Colbert, who is not a similarly situated comparator, Santillana does not argue, and the Court does not find, any person similarly situated to Santillana not belonging to her protected class that was treated differently than Santillana.  Cassa Robertson, Santillana's predecessor, and Melissa Notaro, Santillana's successor, have not been shown by Santillana to be outside Santillana's protected class.  Notaro, like Santillana, is white, and there is no evidence of record disclosing Robertson's race.  (Doc. No. 20 ¶ 4; Doc. No. 73-6 ¶ 2.)  Accordingly, any comparison of Santillana to Robertson or Notaro cannot establish a prima facie case of racial discrimination.  *See Holifield*, 115 F.3d at 1562 (noting that the comparator must be shown by the plaintiff to be outside the plaintiff's protected class).

In summary, because Santillana has failed to produce evidence showing that she was qualified for the position of mediation coordinator and failed to identify a similarly situated comparator, Defendants are entitled to summary judgment on the discrimination claim in Count I.  *See Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998) ("[S]ummary

judgment against the plaintiff is appropriate if [s]he fails to satisfy any one of the elements of a prima facie case.").

### C. Whether Defendants' Non-Discriminatory Reasons Are Pretexual

Assuming, *arguendo*, that Santillana has established a prima facie case of discrimination, Defendants are entitled to summary judgment on the racial discrimination claim because their non-discriminatory reasons for terminating Santillana are not shown by Santillana to be pretextual. Defendants assert that Santillana was terminated because she lacked the necessary computer and management skills for the position of Mediation Coordinator. (Doc. No. 73 at 16.) Santillana does not dispute that these were the reasons provided to her by Fountain and Block for her termination. (Doc. No. 73-1 at 12, 43.) Finding no argument to the contrary, Defendants have satisfied their burden of articulating a legitimate, non-discriminatory reason for the challenged employment action. *See Burdine*, 450 U.S. at 257 (holding that to satisfy its burden, an employer must "produce admissible evidence which would allow the trier of fact to conclude that the employment decision had not been motivated by discriminatory animus.").

Because Defendants have provided legally sufficient non-discriminatory reasons for terminating Santillana, the burden shifts back to Santillana to prove that these non-discriminatory reasons were a pretext for racial discrimination. *Holifield*, 115 F.3d at 1565. The plaintiff meets this burden "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Where, as here, "the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a

motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Santillana argues that because the deposition testimony of Block, Fountain, and Simmons contradicts their respective affidavits, their testimony is rendered "totally without credibility." (Doc. No. 77 at 4.) In considering the instant Motion for Summary Judgment, the Court is prohibited from determining witness credibility and must view all facts in the light most favorable to Santillana. *Anderson*, 477 U.S. at 255; *Hairston*, 9 F.3d at 919. Moreover, as discussed below, no evidence of record, including that which contradicts the testimony of Fountain, Simmons, and Block, presents a genuine issue that the race-neutral reasons identified by Block and Fountain for terminating Santillana were not the actual reasons for her termination or that Santillana was otherwise terminated on account of her race. *Burdine*, 450 U.S. at 256.

### 1. Fraudulent Time Sheets by Colbert

Santillana points out that she and Block dispute whether Colbert submitted fraudulent time sheets. (Doc. No. 77 at 6.) That issue is not material to this case, as there is no evidence of record that Santillana was terminated because Colbert improperly reported her hours. According to Fountain and Block, Santillana excessively complained and was obsessed with Colbert's hours to the detriment of Court administration. (Doc. No. 73-8 at 6; Doc. No. 73-5 ¶¶ 18, 24.) Based on this conduct, Fountain felt that Santillana was incapable of resolving issues on her own and that Santillana lacked the necessary management skills for the position of Mediation Coordinator. (Doc. No. 73-5 ¶¶ 24, 27.) Finding no evidence or arguments to the contrary, the fact that Santillana and Block dispute the accuracy of Colbert's reported hours, by itself, does reasonably call into question whether Santillana's termination due to deficient management and computer skills was pretextual.

## 2.  Adverse Effect of Santillana's Complaints

Santillana argues that there is no evidence supporting Block and Fountain's statements that Santillana's conduct became a major distraction within Court Administration and that, to the contrary, the evidence of record shows that Colbert had problems with the Court Administration staff.  (Doc. No. 77 at 7.)  The fact that Colbert had such problems is irrelevant to the assessments of Block and Fountain that Santillana's complaints about Colbert became disruptive.  Moreover, Santillana does not dispute the frequency or substance of her complaints about Colbert to Fountain and Block, and she cannot demonstrate pretext merely by quarreling with Fountain and Block's sworn assessments concerning how those complaints affected the workplace.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. . . . [T]he employee cannot succeed by simply quarreling with the wisdom of that reason.").  Further, Santillana has not produced any evidence that Block and Fountain did not believe in good faith that Santillana's behavior demonstrated a lack of management skills and was detrimental to Court administration, such that it may be inferred that Block and Fountain were motivated by race.  *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (noting that an employer's good faith determination of the plaintiff's conduct underlying the adverse employment action, no matter how inaccurate, precludes a finding of pretext, so long as that determination was formed in good faith).  Thus, Santillana has failed to show that the disruptive effect of her complaints about Colbert was a pretext for her termination.

### 3.  Mediators' Opinions of Santillana

Santillana appears to argue that the consideration of mediators' opinions about her in the decision to terminate her raises an inference of pretext.  (Doc. No. 77 at 7-8.)  Block averred that "[a]fter evaluating all of [the] input from mediators," she, Fountain, and Simmons "determined that Ms. Santillana would be terminated."  (Doc. No. 77-4 at 6.)  Block further asserted that Santillana was terminated upon consideration of, among other factors, the opinions of Herrman and Poynter that Santillana was "unable to perform the role" of Mediation Coordinator, had no knowledge of the mediation process, was disrespectful to the mediators and Colbert, and was not a team player.  (*Id.*)

These opinions of Herrman and Poynter are not contradicted by their subsequent deposition such that it may be reasonably inferred that Santillana's race, as opposed to her conduct, was the basis for her termination.  *See Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) ("[A] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" (quoting *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006))); *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994) ("[T]he identification of inconsistencies in the defendant's testimony [about the reasons for taking adverse employment action against the plantiff] is evidence of pretext."). Herrman acknowledged during his deposition that he spoke to Block about Santillana prior to her termination, and he could not recall the substance of that conversation.  (Doc. No. 78-2 at 17-18.) Although Herrman testified that he was not present when Santillana made any adverse comments "against or to" Colbert, (*id.* at 16), he did not recall ever noticing that Santillana was disrespectful to mediators.  (*Id.* at 18.)

Poynter testified during her deposition that she never saw Santillana treat mediators with disrespect, (Doc. No. 78-2 at 7), but she explained that she had several problems with Santillana due to her lack of knowledge about the family mediation process and administrative tasks associated with mediation.  (*Id.* at 4-6.)  Poynter further recalled that Santillana said negative things about Colbert outside Colbert's presence, "such as she wasn't running the program well."  (*Id.* at 10.) Finding no evidence to the contrary, there is no genuine dispute concerning the opinions of Herrman and Poynter about Santillana conduct as Mediation Coordinator.  Therefore, the consideration of those opinions in the decision to terminate Santillana does not permit a reasonable inference that Santillana was terminated for pretextual reasons.  *Cf. Evans v. Meadow Steel Prods., Inc.*, 579 F. Supp. 1391, 1395 (N.D. Ga. 1984) (finding evidence of pretext where the plaintiff's supervisor denied making the complaints about the plaintiff's performance which the employer contended were the basis for the plaintiff's termination).

### 4.  Computer Skills

In view of the testimony of Block, Fountain, Muck, and Pizarro documenting Santillana's deficient computer skills, *see supra* part I.A.2, Santillana's contrary assertion that she possessed the requisite computer knowledge and encountered limited difficulties, (Doc. No. 77-4 at 12; Doc. No. 73-1 at 6), without more, does not permit a reasonable finding that terminating Santillana due to her deficient computer skills was pretextual.  *See Holifield*, 115 F.3d at 1565 ("The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance. . . . Thus, where the employer produces performance reviews and other documentary evidence . . . that demonstrate poor performance, an employee's assertions of his own good performance are insufficient to defeat summary judgment, in the absence of other evidence.").

Santillana argues that because "there exists no evidence that [she] ever was given any indication, much less a written warning or a complaint that her computer skills were not in line with what was expected," the "lack of computer skills is simply a facade." (Doc. No. 77 at 10.)  To the contrary, Fountain suggested, albeit "lightheartedly," that Santillana obtain additional computer training after he noticed "her difficulty in using computer programs." (Doc. No. 73-5 ¶ 14.)  In any case, no reasonable inference of pretext exists where an employer fails to warn an at-will employee like Santillana, (Doc. No. 20 at 14), of deficient performance before termination where, as here, there is no evidence of an applicable policy or custom to provide such a warning and no other circumstances cast doubt upon the employer's asserted reasons for termination.  *Compare Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1145 (7th Cir. 1994) (noting that the failure to warn of deficient performance was not evidence of pretext where the employer had no policy obligating a warning and did not warn the plaintiff's predecessor before discharging him for deficient performance), *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1216 (3d Cir. 1988) (finding no pretext from an employer's failure to warn of deficient performance before discharging the plaintiff because "managers are not compelled to convey their dissatisfaction to employees"), *and Baltazar v. Bd. of Educ. of Cecil Cnty.*, No. HAR-89-2667, 1990 WL 71381, at *4 (D. Md. May 24, 1990) ("Standing alone, . . . failure to give notice of unsatisfactory performance to an at will employee will not give rise to a claim of pretext."), *with Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656-67 (11th Cir. 1983) (reasoning that evidence the employer did not warn, reprimand, or relieve the plaintiff of any duties as a result of her conduct in taping another employee's exit interview, which was the company's stated reason for her dismissal seven weeks later, combined with evidence that the plaintiff's supervisor had made age and sex biased comments, assigned particular work to the plaintiff because

she was a woman, and expressed a strong preference of working with men, raised a genuine issue regarding whether the stated reason was a pretext for discrimination); *Argue v. David Davis Enters., Inc.*, No. 02-9521, 2009 WL 750197, at *16 (E.D. Pa. Mar. 20, 2009) (noting that the defendant's failure to warn the plaintiff of performance problems is not in and of itself determinative of discrimination but is a piece of evidence that the jury could weigh along with other evidence that the defendant had warned other employees of performance issues prior to termination but did not do so with the plaintiff); *E.E.O.C. v. Atlanta Gastroenterology Assocs., LLC*, No. 1:05CV2504-TWT, 2007 WL 602212, at **21-23 (N.D. Ga. Feb. 16, 2007) (finding a triable issue of pretext based on the plaintiff's prior positive job evaluations, the absence of a formal notice of deficient job performance, the appearance of criticism of the plaintiff's job performance only after the plaintiff opposed the employer's allegedly discriminatory practices, inconsistent testimony among the decisionmakers pertaining to the plaintiff's job performance, and factual disputes regarding the conduct forming the basis for the plaintiff's termination).  Accordingly, the fact that Santillana was not given a formal warning about her deficient computer proficiency, without more, does not permit an inference of pretext.

### 5. Simmons' Statements About Santillana's Termination

Santillana argues that disparities between the testimony of Simmons and the averments of Judge Alan Dickey regarding Simmons' involvement in Santillana's termination demonstrate pretext.  (Doc. No. 77 at 11.)  The Court disagrees.

Simmons asserted that the final decision to terminate Santillana was made by VanBever and Fountain, with ultimate responsibility falling to VanBever, and that Fountain informed him of Santillana's forthcoming termination merely as a "courtesy advisement."  (Doc. No. 73-3 at 8-9, 12;

Doc. No. 78-4 at 22.)  On the other hand, Dickey recalled Simmons stating that "he had made the decision that Ms. Santillana should be terminated" and that he terminated Santillana because she could not "get along" with Colbert or others in Court Administration, including Kelly Burnett.[4]  (*Id.* at 14-15.)  Resolving all conflicting facts in favor of Santillana at this stage of the proceedings, *Anderson*, 477 U.S. at 255, Simmons was involved in the decision to terminate Santillana, and Santillana was terminated because she could not get along with Colbert and others.  However, there is no evidence of record indicating that Santillana's inability to get along with others was the only reason she was terminated.  Consistent with the fact that Santillana was terminated due to her inability to get along with others, Block and Fountain told Santillana that she was being terminated because she "wasn't a good fit" and "didn't have management skills" and "computer skills."  (Doc. No. 73-1 at 12, 43.)  Finding no contrary evidence of record regarding the reasons for Santillana's termination, pretext cannot reasonably be inferred from Simmons' statement to Dickey that he terminated Santillana because she could not get along with Colbert and others.  *See Phillips v. Aaron Rents, Inc.*, 262 F. App'x 202, 210 (11th Cir. 2008) (finding that the slightly varying reasons given for terminating the plaintiff could not be considered pretextual because they were not "fundamentally inconsistent with one another" and were "never explicitly denied" by the plaintiff); *Tidwell v. Carter Prods.*, 155 F.3d 1422, 1428 (11th Cir. 1998) ("[T]he existence of a possible additional, [undisclosed], non-discriminatory basis for [the plaintiff's] termination does not . . . prove pretext.").

---

[4] Although Simmons could not recall during his deposition previously thinking that Santillana and Burnett did not get along, (Doc. No. 78-4 at 18), there is no evidence of record disputing Simmons' assessment of the relationship between Santillana and Burnett at the time of Santillana's termination.

In addition, pretext cannot be inferred from gossip about Santillana's drinking and partying. Simmons testified that he heard "idle gossip" that Santillana had been "drinking or something at a party" and that he "discounted it because it didn't jibe with what I knew about [Santillana], and . . . it didn't matter." (Doc. No. 78-4 at 12.) Simmons further stated that he did not tell this information to "anybody." (*Id.* at 19.) However, according to Dickey, Simmons told him that "he felt that Ms. Santillana's alleged social activities were not appropriate for a representative of the judiciary" and that "she had talked about a particular evening where she had gone out to a lounge and had too much to drink and was 'partying.'" (*Id.* at 15.) Although this testimony presents a genuine issue about whether Simmons spread "idle gossip" about Santillana to Dickey, that issue is not material to the pretext inquiry because Simmons explicitly stated that the gossip "didn't matter," (Doc. No. 78-4 at 12), and because no evidence suggests that Simmons factored the conduct underlying the gossip into the decision to terminate Santillana.

In any case, even if it may be inferred that the consideration of idle gossip of Santillana's drinking and partying factored into Simmons' decision to terminate Santillana, Santillana does not produce any admissible evidence disputing the substance of the gossip heard by Simmons or Dickey.[5] Additionally, any consideration of Santillana's rumored drinking and partying in the decision to terminate her, without more, does not rebut "head on" the other asserted non-

---

[5] Santillana testified that she heard through her attorney, who learned from an unidentified third person, that Simmons stated that Santillana was "wild." (Doc. No. 73-1 at 40.) Although Santillana denies that she was "wild," (*id.*), Santillana has not shown herself to have personal knowledge that Simmons made that statement. Accordingly, even in the absence of an objection by Defendants, the Court will not consider the alleged statement by Simmons that Santillana was "wild" for purposes of this Motion. *See CMS Indus., Inc. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289, 295 (5th Cir. 1981) (noting that a district court has discretion to refuse to consider assertions made in opposition to summary judgment without personal knowledge even where no objection is raised (citing *Becker v. Koza*, 53 F.R.D. 416, 419 (D. Neb. 1971)).

discriminatory reasons for Santillana's termination, notably her lack of management and computer skills. *See Crawford*, 482 F.3d at 1308 (noting that to withstand a motion for summary judgment, the plaintiff must meet "head on" and rebut each of the asserted non-discriminatory reasons for the adverse employment action). At most, the substance of the gossip was an additional, undisclosed non-discriminatory basis for Santillana's termination, which does not permit an inference of pretext. *See Tidwell*, 155 F.3d at 1428 ("[T]he existence of a possible additional, [undisclosed], non-discriminatory basis for [the plaintiff's] termination does not . . . prove pretext."). Accordingly, the testimony of Simmons conflicted by other evidence of record does not permit a reasonable inference that Santillana was terminated on the basis of race.

### 6. Comparison with Notaro

In an attempt to show that "she was terminated in order for Defendants to avoid an investigation and ultimate conflict with Colbert," Santillana points to similarities between how her supervisors treated her and Melissa Notaro, the Mediation Coordinator who replaced Santillana. (Doc. No. 77 at 16-18.) Generally, "evidence of an employer's treatment of other employees of the same protected class as the plaintiff [may show that] the employer acted with the prohibited discriminatory intent in its actions toward the plaintiff." *L'Etoile v. New England Finish Sys.*, 575 F. Supp. 2d 331, 335 (D.N.H. 2008); *see also Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286 (11th Cir. 2008) (finding the testimony of the plaintiff's coworkers regarding the actions of their mutual supervisor and another person involved in the challenged termination decision probative of the intent to discriminate against the plaintiff). However, "'such evidence is neither per se admissible nor per se inadmissible,' . . . but 'depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" *L'Etoile*, 575 F. Supp. 2d

at 335 (quoting *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 381, 388 (2008)).  Because the evidence of record shows that Fountain and other supervisory personnel treated Santillana and Notaro differently under different circumstances while serving as Mediation Supervisor, Santillana's comparison of herself and Notaro does not permit an inference that Santillana was terminated on the basis of race as opposed to her deficient management and computer skills.

By requesting computer support on over a dozen occasions and admitting that she was "computer illiterate" and had others at her previous job perform the computing tasks required of the Mediation Coordinator, Santillana showed a lack of proficiency with Microsoft Outlook, Word, and Excel.  *See supra* part I.A.2.  There is no evidence of record that Notaro had similar issues with computing tasks in Microsoft Outlook, Word, and Excel.  Further, unlike Santillana, who repeatedly ask Colbert for assistance with the same functions of the Foxpro mediation software, (Doc. No. 73-4 ¶¶ 9-10; Doc. No. 83-9 at 3), Notaro taught herself functions in Foxpro beyond what Colbert showed her.  (Doc. No. 77-2 at 8.)

Disparities in the attempted management of Colbert by Santillana and Notaro also preclude any relevant comparison.  Santillana's frustrations with Colbert were reported with such frequency to Fountain that the functioning of Court administration was impaired.  (Doc. No. 73-5 ¶¶ 18-19, 23-24.)  In addition, Santillana broke down crying during one report of Colbert's conduct to Fountain, (Doc. No. 78-3 at 9), and Santillana "jumped out of her seat," "yelled," and "stormed out of" a meeting with Colbert, Fountain, and Block.  (Doc. No. 73-5 ¶ 26.)  On the other hand, Notaro responded to Colbert's insubordination by documenting issues concerning Colbert by email, (Doc. No. 77-2 at 10), and there is no evidence of record that Notaro cried or yelled when dealing with Colbert.  In view of this disparate conduct of Notaro and Santillana as Mediation Coordinator, any

differences in the treatment of Santillana and Notaro by supervisory personnel do not permit a reasonable inference that Santillana was terminated on the basis of race. *L'Etoile*, 575 F. Supp. 2d at 335.

Santillana further notes that Colbert was hostile and disrespectful to her and Notaro and that Colbert was not disciplined by Fountain or Block. (Doc. No. 77 at 16.) The failure of Block or Fountain to discipline Colbert for rudeness to her supervisors, without more, is not probative of a discriminatory motive against Santillana by Fountain or Block. *See Wilson*, 376 F.3d at 1092 ("The role of this Court is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments." (internal quotation omitted)); *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (noting that federal laws against discrimination are "not a shield against harsh treatment at the work place" or personal animosity).

### 7.  Santillana's Assertions of Discrimination

Santillana conceded that at no time did Block, Fountain, or Simmons say anything to her about her race or Colbert's race, (Doc. No. 73-1 at 39-40), and she has produced nothing more than conclusory statements to show that her race factored into the decision to terminate her. Santillana asserted in her interrogatory responses that her discrimination claim arises out of actions by Block, Fountain, and Simmons to avoid a "Civil Rights Discrimination Action" against the Seminole County Circuit Court.[6] (Doc. No. 73-16 at 10.) There is no evidence of record disclosing who stated that three previous complaints had been filed or that Block, Fountain, or Simmons expressed an

---

[6] Santillana further contended that "[i]t was stated that there had been three complaints filed, and one investigation and Fountain did not want another investigation." (Doc. No. 73-16 at 10.) Because Santillana has not identified who made this statement or established personal knowledge of the facts therein, that statement will not be considered by the Court on this Motion. *See supra* note 5.

intent to avoid a race discrimination claim by Colbert.  Santillana testified that after she told Fountain that Colbert had been arriving late, Fountain said "deal with it because I don't want any more complaints or another investigation." (Doc. No. 73-1 at 14.)  However, Santillana did not ask Fountain, and there is no evidence of record indicating, what he meant by "another investigation." (*Id.*)  Accordingly, it cannot reasonably be inferred from the evidence of record that the investigation Fountain sought to avoid was a "Civil Rights Discrimination Action" filed by Colbert.

When asked to explain during her deposition how she suffered discrimination on the basis of race, Santillana responded that Colbert was "allowed to come in late" and "allowed to do all those things that I wasn't allowed to do," simply because Colbert was black and she was white.  (Doc. No. 77-4 at 46-47.)  However, as discussed *supra* part I.B, Santillana has failed to identify any instance where a privilege given to Colbert was not available to her.

In summary, Santillana's evidence of race discrimination amounts to nothing more than her conclusory allegations, unsupported by any evidence of record, that she was terminated "because [she] was white and [Colbert] was black." (Doc. No. 73-1 at 44.)  In light of Defendants' unrefuted, non-discriminatory reasons for terminating Santillana, Santillana's conclusory allegations of discrimination, without more, do not raise an inference of pretext, and Defendants are entitled to summary judgment on the racial discrimination claim in Count I.  *See Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987) ("[Plaintiff's] conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [the defendant] has offered such extensive evidence of legitimate, nondiscriminatory reasons for its actions. . . . Under these circumstances, [the defendant] was entitled to summary judgment.").

### D.  Qualified Immunity

"The doctrine of qualified immunity shelters government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bryant v. Jones*, 575 F.3d 1281, 1295 (11th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "To receive qualified immunity, the public official must establish that he was engaged in a 'discretionary function' at the time he committed the allegedly unlawful act."  *Id.* (citing *Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004)).  Defendants assert, and Santillana presents no argument in opposition, that they were acting within their discretionary authority when the alleged wrongful acts occurred.  (Doc. No. 73 at 21.)  Thus, "the burden shifts to the plaintiff to prove that the official is not entitled to qualified immunity."  *Bryant*, 575 F.3d at 1295 (citing *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)).  This requires plaintiff to show: (1) that the defendant violated a constitutional right; and (2) that the constitutional right was clearly established at the time of the alleged wrongful act.  *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  These factors may be addressed in either order.  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

With respect to the second element, the right to be free from employment discrimination on the basis of race is clearly established.  *E.g.*, *Rioux v. City of Atlanta*, 520 F.3d 1269, 1283 (11th Cir. 2008); *Bogle v. McClure*, 332 F.3d 1347, 1355 (11th Cir. 2003); *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1378 (11th Cir. 1997).  However, the first element is not satisfied because, as discussed in detail *supra* part I.C, unrefuted evidence of record shows that Defendants acted with lawful, race neutral motivations in terminating Santillana's employment.  *See Ham v. City of*

*Atlanta, Ga.*, 386 F. App'x 899, 905 (11th Cir. 2010) (noting that where the facts viewed in the light most favorable to the plaintiff "show that the defendant acted with both lawful and unlawful motivations, the defendant is entitled to qualified immunity" on a Section 1983 employment discrimination claim) (citing *Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996)); *Stanley v. City of Dalton*, 219 F.3d 1280, 1296 (11th Cir. 2000) ("[The] defendant is entitled to qualified immunity . . . where . . . the record indisputably establishes that the defendant in fact was motivated, at least in part, by lawful considerations."). Accordingly, Defendants are entitled to qualified immunity on the discrimination claim in Count I.

## II.  Count IV: Civil Conspiracy by Block, Fountain, and Simmons

In Count IV of the Amended Complaint, Santillana claims that Simmons, Fountain, and Block unlawfully conspired to terminate her on the basis of race in violation of 42 U.S.C. § 1985(3). (Doc. No. 20 at 12-13.)  The elements of this claim are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Trawinski v. United Techs.*, 313 F.3d 1295, 1299 (11th Cir. 2002).

"The second element requires a showing of 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 628 (11th Cir. 1992) (quoting *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 829 (1983)).  As discussed in detail *supra* part I, Santillana has failed to produce any evidence from which it may reasonably be inferred that she was terminated

by Simmons, Fountain, or Block on the basis of race or any other "invidiously discriminatory" characteristic, as opposed to the fact that her management and computer skills were found to be deficient.  Therefore, Santillana has failed to establish the existence of a conspiracy under 42 U.S.C. § 1985(3).

Alternatively, Santillana's conspiracy claim fails due to the application of the intracorporate conspiracy doctrine, which provides that employees of a public, governmental entity or a private corporation, when acting as agents of the entity or corporation, "are deemed incapable of conspiring among themselves or with the corporation."  *Dickerson v. Alachua Cnty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000).  Because Simmons, Fountain, and Block were employees of the Seminole County Circuit Court at all times relevant to this case, (Doc. No. 73-3 at 5; Doc. No. 73-5 ¶ 1; Doc. No. 83-8 ¶ 1), the intracorporate conspiracy doctrine bars them from being held liable for conspiring to terminate Santillana's employment as Mediation Coordinator.  *See Dickerson*, 200 F.3d at 767-68 (applying the intracorporate conspiracy doctrine to bar a civil rights conspiracy claim brought against a county jail and several employees by a black employee who allegedly was demoted pursuant to a conspiracy among white jail officers to blame him for an inmate's escape).  Accordingly, Defendants are entitled to summary judgment on the conspiracy claim in Count IV.

## Conclusion

Based on the foregoing, it is **ORDERED** and **ADJUDGED** that the Motion for Summary Judgment by Defendants Clayton Simmons, Sue Block, and Wayne Fountain (Doc. No. 73) is **GRANTED**.  The Clerk of Court is directed to enter judgment in favor of Defendants Clayton Simmons, Sue Block, and Wayne Fountain and against Plaintiff Shirley F. Santillana on Counts I and IV and to close the case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on February 23, 2011.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record